## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| FLORAL ART, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant. | No. 20-688-MHS <br><br> Judge Matthew H. Solomson <br><br> *Electronically Filed July 26, 2021* |

## JOINT STATUS REPORT

Pursuant to the Court's June 14, 2021 Order (ECF No. 30) the Parties provide the following update on the status of the litigation and proposal for further proceedings.

Since the filing of the last status report, ECF No. 29, the Surface Transportation Board ("STB") extended the date for the expiration of the Notice of Interim Trail Use ("NITU") to June 5, 2022 (the NITU was set to expire June 5, 2021) in order to permit trail use negotiations to continue. *See* Ex. 1. Specifically, the STB explained that:

> "[T]he Idaho Department of Transportation (IDT) has indicated to the City [of Idaho Falls] that IDT is interested in pursuing the transaction on behalf of the City. According to the City, IDT has informed the City that IDT has made progress in its negotiations with [Eastern Idaho Railroad], and that both IDT and [the railroad] desired the City to request a one-year extension of the NITU negotiating period in order to complete negotiations."

Ex. 1. The Parties disagree about how the status of these negotiations should impact further proceedings, and provide their differing recommendations to the Court as to next steps in the litigation below.

**Plaintiffs' Position**

All issues as to title are resolved and the claims are ripe for a liability decision by this Court. Accordingly, these Plaintiffs request to file a RCFC 56 motion on September 17, 2021

asking the Court to find the government liable for a taking of their property. Plaintiffs strongly oppose any delay in resolution of their claims based upon the Federal Circuit's affirmance of the government's liability in *Caquelin v.United States*, 959 F.3d 1360 (Fed. Cir. May 29, 2020). If the government's position is that the Federal Circuit's decision in *Caquelin* implicitly changed the governing law; the government is certainly welcome to address that decision in its response brief (or any cross-motion).

There are simply no efficiencies gained in a "wait and see" approach to this case. The decisions from the Supreme Court and this Court, among others, are clear: when the government invokes Section 1247(d) of the Trails Act, a Fifth Amendment taking occurs for which landowners must be paid just compensation. Initially, in *Preseault I*, the Supreme Court clarified that the Trails Act is constitutional so long as the landowner is paid just compensation. Ultimately, the Supreme Court explained that the Fifth Amendment "does not prohibit the taking of private property, but instead places a condition on the exercise of that power," specifically the payment of just compensation to the landowner. *Id.* at 11 (citation omitted). *See also* U.S. CONST. amend. V. ("nor shall private property be taken for public use, without just compensation.") Phrased differently, as this Court later did, "having and exercising the power of preemption is one thing; being free of the Constitutional obligation to pay just compensation for the state-created rights thus destroyed is another." *Preseault II,* 100 F.3d at 1537.

If, when, and under what circumstances the use of Section 1247(d) constitutes a taking went partially unanswered in *Preseault I*, as the question was deemed premature—the landowners had not yet availed themselves of the Tucker Act. 494 U.S. at 17. *See* 28 U.S.C. § 1491(a)(1). The Supreme Court showed its hand though, observing that while "only some rail-to-trail conversions will amount to takings[,]" this was because "[s]ome rights-of way are held in fee

simple" while others are "easements that do not even as a matter of state law revert [to the landowner] upon interim use as nature trails." 494 U.S. at 16. The implication, of course, being that where a reversionary property right exists and is delayed by the government's exercise of Section 1247(d), a taking has occurred for which compensation must be provided.

In *Preseault II*, the Federal Circuit ruled that, under certain circumstances, the federal government is liable to property owners for taking their property when it invokes Section 1247(d) of the Federal Trails Act. 100 F.3d at 1531 ("[W]e conclude that the taking that resulted from the establishment of the recreational trail is properly laid at the doorstep of the Federal Government."). In a takings case, "persons with a valid property interest at the time of the taking are entitled to compensation." *Wyatt v. U.S.*, 271 F.3d 1090, 1096 (Fed. Cir. 2001).

In *Ellamae Phillips Co.*, the Federal Circuit affirmed *Preseault II*'s holding that a compensable Trails Act taking occurs when the railroad held an easement limited to railroad purposes or when a railroad held only an easement that would otherwise have been abandoned under state law. 564 F.3d at 1373. *Ellamae Phillips Co.* held "***the determinative issues for takings liability***" are as follows:

1. [W]ho owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate;

2. [I]f the railroad acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and

3. [E]ven if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).

*Id.* (reformatted) (emphasis added); *see also Preseault II*, 100 F.3d at 1533. By 2010, this Court was unequivocal, pronouncing that it was "settled law" that a taking occurs "when government action destroys state-defined property rights by converting a railway easement to a recreational

3

trail." *Ladd v. United States*, 630 F.3d 1015, 1019 (Fed. Cir. 2010), *reh'g denied*, 646 F.3d 910 (Fed. Cir. 2011) ("*Ladd I*") (holding that the landowner suffered a compensable taking because the STB had issued a NITU authorizing trail use of Plaintiffs' land although no trail-use agreement was ever reached).

More recently, the Supreme Court of the United States issued opinions in *Knick v. Twp. of Scott*, 139 S.Ct. 2162 (2019) and *Cedar Point Nursery v. Hassid*, __ U.S. ___ (Slip op. Jun. 23, 2021), that make clear that when the government violates the constitution by taking private property without compensation, the right to such compensation is effective "immediately."

While primarily a case regarding the right to bring a takings claim in federal court, in its recent opinion in *Knick*, the Supreme Court went to great lengths to explain that the Constitution is violated when the government takes private property for a public use without compensation, and that subsequent events cannot undo the constitutional violation once it occurs:

- "A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Id.* at 2167.

- "We have long recognized that property owners may bring Fifth Amendment claims against the Federal Government as soon as their property has been taken." *Id*. at 2170. "And we have explained that 'the act of taking' is the 'event which gives rise to the claim for compensation.' " *Id.* (quoting *United States v. Dow*, 357 U.S. 17, 22 (1958)).

- "The Fifth Amendment right to full compensation arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner. That principle was confirmed in *Jacobs v. United States*, 290 U.S. 13, [17] (1933), where we held that a property owner found to have a valid takings claim is entitled to compensation as if it had been paid contemporaneously with the taking—that is, the compensation must generally consist of the total value of the property when taken, plus interest from that time." *Knick*, 139 S.Ct. at 2170 (internal quotations omitted).

- "[A] property owner has a Fifth Amendment entitlement to compensation as soon as the government takes his property without paying for it." *Id.*

- "In sum, because a taking without compensation violates the self-executing Fifth Amendment at the time of the taking, the property owner can bring a federal suit at

4

that time.  Just as someone whose property has been taken by the Federal Government has a claim 'founded . . . upon the Constitution' that he may bring under the Tucker Act . . . ." *Id.* at 2172.

Particularly relevant to the government's argument in this case (as well as in *Caquelin*) is the *Knick* Court's steadfast repudiation that events subsequent to a taking bear upon the government's liability; a potentially temporary taking is still a taking:

> [I]n *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304 [](1987), the Court returned to the understanding that the Fifth Amendment right to compensation automatically arises at the time the government takes property without paying for it.  Relying heavily on *Jacobs* and other Fifth Amendment precedents . . . *First English* held that a property owner is entitled to compensation for the temporary loss of his property.  We explained that "government action that works a taking of property rights necessarily implicates the 'constitutional obligation to pay just compensation.'"

*Knick*, 139 S.Ct. at 2171 (quoting *First English*, 482 U.S. at 315).

The *Knick* Court held that subsequent government action that renders what at first appears to be a permanent taking into a temporary one does not cure the constitutional violation where no just compensation is paid.  *Id.*  The Court again underscored that later payment of compensation may remedy the violation, but it cannot nullify it:

> A later payment of compensation may remedy the constitutional violation that occurred at the time of the taking, but that does not mean the violation never took place.  The violation is the only reason compensation was owed in the first place.  A bank robber might give the loot back, but he still robbed the bank.

*Id.* at 2172.

Recently, in *Cedar Point Nursery v. Hassid*, __ U.S. ___ (Slip op. Jun. 23, 2021); the Court defined "[t]he essential question" in determining whether a *per se* physical takings has occurred as "whether the government has physically taken property for itself or someone else-by whatever means-or has instead restricted a property owner's ability to use his own property."  *Cedar Point Nursery,* p. 6-7 (citing *Tahoe-Sierra*, 535 U.S. at 321-323).  "The right to exclude is 'one of the most treasured' rights of property ownership."  *Cedar Point Nursery*, p. 7 (citing *Loretto v.*

5

*Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982).  "Given the central importance to property ownership of the right to exclude, it comes as little surprise that the Court has long treated government-authorized physical invasions as takings requiring just compensation." *Cedar Point Nursery*, p. 8.

The government's approach in this case is to authorize a use of Plaintiffs' land that is contrary to state law (trail use), give it to the railroad to market and possibly profit from as a trail, and then wait and see what happens.  This approach would shift the focus in Trails Act takings cases to first ensuring the government has achieved its goal of "railbanking" before evaluating the effect the issuance of the government's order has on an owner's land.  For more than a century, the Supreme Court has instructed courts to do just the opposite and focus on the landowner's loss, not the government's gain.  *Bos. Chamber of Commerce v. City of Bos.*, 217 U.S. 189, 195 (1910) ("[The Fifth Amendment] merely requires that an owner of property taken should be paid for what is taken from him.  It deals with persons, not with tracts of land.  And the question is, What has the owner lost? not, What has the taker gained?").

Simply put, the government cannot square its position with existing precedent that "[a]s soon as private property has been taken . . . the landowner has *already* suffered a constitutional violation, and the self-executing character of the constitutional provision with respect to compensation, is triggered." *San Diego Gas & Elec. v. City of San Diego*, 450 U.S. 621, 654 (1981) (Brennan, J., dissenting) (emphasis original) (internal citations and quotation marks omitted) (observing also that the Court "has consistently recognized that the just compensation requirement in the Fifth Amendment is not precatory: once there is a 'taking;' compensation *must*

be awarded.").[1]

Accordingly, Plaintiffs' position is that the government has taken their property and that taking is ongoing as of the date of this filing. Because all title issues are resolved, there is no reason to hold this case in abeyance awaiting the outcome of negotiations between two third parties to this litigation. Plaintiffs request to proceed to summary judgment on the issue of the government's liability now.

**Defendant's Position**

Given the STB's recent extension of the date for expiration of the NITU, as well as the fact that trail use negotiations remain ongoing, the United States believes the most efficient use of the Court and the Parties' resources is to stay this matter until there is further clarity regarding the status of trail use negotiations and Eastern Idaho Railroad ("EIRR"), as well as EIRR's intentions as to abandonment for any portion of the corridor for which it is unable to reach a trail use agreement.

As an initial matter, although Plaintiffs premise their argument on their belief that issuance of the NITU on June 5, 2020 effected a taking, EIRR has indicated on numerous occasions that it sought abandonment authority from the STB solely to facilitate trail use negotiations. *See* Ex. 2 (STB June 3, 2021 letter). In fact, the Railroad previously indicated that it only filed the notice of abandonment "to facilitate an arrangement whereby the subject line segment [ ] could be dedicated to municipal recreational use under the Board's interim trails use procedures" and that "[b]ut for such an understanding with the City, [the railroad] would not have sought authorization to abandon the" corridor. Ex. 3 (STB Apr. 16, 2020 filing).

---

[1] A majority of the Court in *First English* would, six years later, adopt Justice Brennan's dissent from *San Diego Gas*, *see First English*, 482 U.S. at 318, which would later support Justice Brennan's ruling in *Preseault I*. 494 U.S. at 11, 14.

7

As such, absent a trail use agreement, Plaintiffs cannot presently show issuance of the NITU caused a taking, as EIRR has indicated it would not have otherwise sought to abandon the corridor and there would have been no change in Plaintiffs' property interests as to the railroad corridor. *See Caquelin v. United States*, 959 F.3d 1360, 1362 (Fed. Cir. 2020) ("The NITU does not effect a taking if, even in the absence of a NITU, the railroad would not have abandoned its line (a necessary prerequisite for termination of the easement under state law) during the period of the NITU: in such a case, the NITU takes nothing."); *see also, e.g.*, *Hardy v. United States*, 153 Fed. Cl. 287, (2021) ("This case presents the apparently rare situation in which the Notice of Exemption and NITU, documents that would suggest an intent to abandon in most cases, are actively contradicted by other evidence."). Indeed, a railroad must formally abandon a corridor, and there is no evidence that EIRR will do so here if it cannot reach a trail use agreement. *See* 49 C.F.R. § 1152.29(e)(2) (requiring that railroads file a "notice of consummation with the [STB]" signifying that they have exercised the abandonment "authority granted").

Moreover, the IDT recently indicated that ongoing trail use negotiations only concern a portion of the rail corridor subject to the NITU, specifically the portion from mile point 184.62 to mile point 184.14. However, Plaintiffs' operative Complaint concerns the entire corridor (from mile point 184.90 to 184.14). *See* ECF No. 24 ¶ 9. As such, the portion of the corridor subject to ongoing trail use negotiations may not be adjacent to at least some of the current Plaintiffs' properties, such that those Plaintiffs may have no takings claim at all. *See Ellamae Phillips Co. v. United States,* 564 F.3d 1367, 1373 (Fed. Cir. 2009). But the Court likely will not be able to determine that fact conclusively until the final resolution of the trail use negotiations.

And while Plaintiffs claim that the United States' preferred "wait and see" approach would lead to a "delay in resolution," of this lawsuit, Plaintiffs' arguments are simply an attempt

to outrun factual development in this matter. Based on EIRR's emphatic statements, there is: 1) no evidence the railroad intends to abandon the line if trail use negotiations fail; 2) no evidence the existence of the NITU is delaying the railroad's abandonment of the line; and 3) no certainty that the railroad will enter a trail use agreement. As such, Plaintiffs' attempt to brief liability is premature and would require this Court to render a decision without crucial facts to establish causation under binding precedent.

In sum, because crucial factual issues that bear on any future liability determination this Court is asked to make are presently uncertain, the best use of the Court and the Parties' resources is to stay this matter while trail use negotiations continue. The United States therefore requests that the Court stay this matter, and that the Parties file status reports every six months regarding the progress of trail use negotiations.

Respectfully submitted this 26th day of July 2021,

**LEWIS RICE, LLC**

*/s/ Meghan Largent*
Lindsay S.C. Brinton
Meghan S. Largent
Lewis Rice LLC
600 Washington Avenue, Suite 2500
St. Louis, Missouri 63101
(314) 444-7704
(314) 612-7723 (fax)
mlargent@lewisrice.com

*Attorneys for Plaintiffs*

JEAN E. WILLIAMS
Acting Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

*/s/ Gregory Cumming*
Gregory Cumming (D.C. Bar No. 1018173)

United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
150 M St., N.E.
Washington, D.C. 20002
(202) 305-0457
gregory.cumming@usdoj.gov

*Counsel of Record for the United States*
